## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Idonna Jean Miller, | Civil No. 11-2063 (SRN/AJB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Northwest Airlines, Inc.; Delta Air Lines, Inc., as Successor in Interest; Kathleen A. Swanson; Pamela M. Hegstrom; Chris E. Talbert; and Francelle L. Slocum, | |
| Defendants. | |

Idonna Jean Miller, 4259 Amber Court, Eagan, MN 55122, pro se Plaintiff.

Gregory J. Stenmoe and Britt M. Gilbertson, Briggs and Morgan, P.A., 2200 IDS Center, 80 South 8th Street, Minneapolis, MN 55402, for Defendants.

This matter is before the Court, United States Chief Magistrate Judge Arthur J. Boylan, on Defendants' Motion for Summary Judgment. (Docket No. 95.) The matter has been referred to the magistrate judge for report and recommendation to the district court under 28 U.S.C. § 636 and Local Rule 72.1(b). A hearing was held on the motion on April 10, 2013 at the U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota. Plaintiff appeared pro se. Britt Gilbertson and Gregory Stenmoe appeared on behalf of Defendants.

Plaintiff asserts claims of interference and retaliation under the Family and Medical Leave Act ("FMLA"). For the reasons discussed below, the Court recommends that Defendants' motion for summary judgment be granted.

## BACKGROUND

## I.      THE PARTIES

Plaintiff Idonna Miller is a former employee of Defendant Northwest Airlines, Inc.

("Northwest").[1]  Miller commenced employment with Northwest on February 23, 1987, when

she was hired as an Intermediate Revenue Clerk.  (Docket No. 98, Affidavit of Britt M.

Gilbertson, Ex. 7.[2])  During the relevant period, Miller held the position of Cargo Customer

Service Representative.  (Ex. 1, Deposition of Idonna Jean Miller ("Miller Dep.") 77.)  On July

24, 2008, Northwest terminated Miller's employment.  (Ex. 44.)

As a Cargo Customer Service Representative, Miller worked in Northwest's Cargo Call

Center and was responsible for taking and responding to phone calls from Cargo customers

relating to shipping and tracking freight.  (Miller Dep. 77, 79-80.)  During the relevant period,

Miller's supervisors were Defendants Pamela Hegstrom and Chris Talbert, who were assistant

managers in the Cargo Call Center.  (Ex. 2, Deposition of Pamela Hegstrom ("Hegstrom Dep.")

8; Ex. 3, Deposition of Chris Talbert ("Talbert Dep.") 10.)  Hegstrom and Talbert reported to

Defendant Kathleen Swanson, who was the manager of the Cargo Call Center.  (Ex. 5,

Deposition of Kathleen Swanson ("Swanson Dep.") 8-9.)  Defendant Francelle Slocum was a

human resources manager who worked with the Cargo department.  (Ex. 6, Deposition of

Francelle Slocum ("Slocum Dep.") 7-8.)

## II.     MILLER'S REQUESTS FOR FMLA LEAVE

During her employment at Northwest, Miller requested and received leave pursuant to the

FMLA on numerous occasions.  Between 2004 and 2008, Northwest approved at least eight

---

[1]      Northwest merged into Defendant Delta Air Lines, Inc. ("Delta") effective December 31, 2009, after Miller's employment with Northwest was terminated.  (Docket No. 25, Def. Answer at ¶ 8.)

[2]      Hereafter, all references to Exhibits refer to the Affidavit of Britt M. Gilbertson.

requests for FMLA leave from Miller.  (*See* Exs. 10-12.)  Several of these requests were related to chronic neck and back muscle strain dating from a September 1996 injury and were supported by medical certifications completed by Dr. Ronald Bateman.  (*See id.* at Ex. 10.)

On October 25, 2007, Miller suffered an injury to her leg.  (*See* Compl. ¶ 21.)  She requested FMLA leave for time off associated with the leg injury, which request was assigned "Case No. 511" by Northwest.  (*Id.*)  On November 6, 2007, Chris Talbert informed Miller that her request for FMLA leave was denied and gave her the "Family Medical Leave (FML) Response" form denying her request on the basis of "medical certification was not adequate and/or does not support that the requested leave is FML-qualifying."  (*Id.*)  When Miller questioned the denial, Talbert informed her that the request had been denied because Miller had not been absent for three days.  (*Id.*)

On April 29, 2008, Miller submitted a request for FMLA leave for chronic neck and back pain relating to the 1996 injury and supported by a medical certification completed by Dr. Bateman, similar to multiple previous requests by Miller.  (*See* Exs. 20-21.)  Northwest assigned Miller's request "Case No. 602."  (Ex. 20.)  The medical certification provided for Miller's absence up to 20 hours per week due to inability to work.  (Ex. 21.)  While most of Dr. Bateman's previous medical certifications listed the probable duration of Miller's serious health condition as either six months or one year, Case No. 602 listed the probable duration as "permanent/indefinite."  (*See* Exs. 10-11, 21.)[3]  The probable duration of Miller's present inability to work was listed as "periodic."  (*Id.*)

Northwest's Director of Labor Relations, Michael Cvengros, reviewed Miller's Case No. 602 request and believed Dr. Bateman's FMLA certification form providing for Miller's 20

---

[3]     At least one prior medical certification from Dr. Bateman in May 2007 had listed the probable duration of Miller's serious health condition as "indefinite."  (Ex. 11.)

hours per week intermittent leave was conflicting with a statement by him that she could work full time. (Ex. 22.) Northwest decided to seek a second opinion regarding Miller's need for FMLA leave for chronic neck and back pain and on May 2, 2008, Talbert informed Miller that her request for FMLA leave was under review and a determination would be made pending receipt of additional medical information from an outside health care provider. (*See* Ex. 23.) Northwest's FMLA policy provides that "[w]here the Company has reason to doubt the validity of the information provided on a medical certification, the Company may require that the employee. . .take part in a second opinion at the Company's expense. The Company is permitted to designate the health care provider to furnish a second opinion." (Ex. 9.) Miller was scheduled for an independent medical examination with Dr. Brad Helms on May 22, 2008. (Ex. 24.) While Miller's Case No. 602 was under review, Northwest granted another request by Miller for FMLA leave, relating to ACL reconstruction, on June 25, 2008. (*See* Ex. 12.)

Northwest received Dr. Helms' report on Miller's independent medical examination on July 2, 2008. (Exs. 30, 31.) Dr. Helms found no objective findings to correlate with Miller's subjective complaints of back and neck pain and noted that Miller's multiple previous medical providers had also found no objective findings on examination. (Ex. 30.) Dr. Helms noted only mild subjective complaints and concluded that Miller's 1996 injury had healed and resolved. (*Id.*) Dr. Helms found that no additional treatment of any kind was medically necessary and concluded that "further passive care or treatment by Dr. Bateman is not indicated, medically reasonable or appropriate, and within a reasonable degree of medical certainty, not adequately supported by medical records." (*Id.*) Dr. Helms found that Miller had no physical limitations or restrictions on work duties or normal activities of daily living and that the only medication necessary or indicated would be the occasional use of Tylenol. (*Id.*)

After Northwest received the medical report from Dr. Helms, it decided to deny Miller's

Case No. 602 request for FMLA leave. (*See* Exs. 32-33.) FMLA decisions at Northwest were

made by Family Medical Leave ("FML") Specialists in the FML Department. (Talbert Dep.

160-61; Slocum Dep. 9.) Northwest's FML Specialist Hazel Taylor initially drafted a letter for

Talbert's signature informing Miller that Case No. 602 was denied. (Swanson Dep. 227-228; Ex.

32.) Talbert requested revisions to the draft letter, which had contained a description of Dr.

Helms' medical findings that Talbert did not understand. (Talbert Dep. 168-69; Ex. 32.)

Talbert's supervisor Swanson circulated a revised letter, which Taylor approved. (Ex. 33.)

Managers and assistant managers like Talbert and Swanson played an administrative role in

Northwest's FMLA request claim processing, such as providing employees with certification

paperwork when the employee requests FMLA leave and communicating leave decisions to

employees, but played no role in approving or denying the requests for leave like Miller's.

(Talbert Dep. 12-16, 160-61; Swanson Dep. 78-80, 222-223; Hegstrom Dep. 22; Slocum Dep. 9.)

Swanson gave Miller the revised letter on July 3, 2008, which advised Miller:

> Based on the information provided by Dr. Bradley Helms, MD., your request for
> Family Medical Leave has been denied. It is Dr. Helms' findings you do not have
> any physical limitations or restrictions on work duties or normal activities of daily
> living, and that no further treatment is warranted.
>
> Your FML request has been denied due to the following reason:
>
> 1.     The information provided by the Health Care Provider does not support
>          leave due to a Serious Health Condition.

(Ex. 34.)

Northwest did not seek a third medical opinion regarding Miller's Case No. 602 request.

(Miller Dep. 107.) Northwest's FMLA policy provides that [w]here the opinions of the

employee's. . .health care provider and the Company's designated health care provider differ, the

Company may require a third medical opinion, again at the Company's expense. A third health care provider, if required by the Company will be approved jointly by the Company and the employee. . .and the opinion of this health care provider will be considered final and binding." (Ex. 9; *see also* Slocum Dep. 12.)

## III.    EVENTS RELATING TO MILLER'S STAMP BUSINESS

Apart from her work at Northwest, Miller also worked as an independent demonstrator for a business called Stampin' Up, a home-based business in which independent demonstrators sell rubber stamps, paper products, and other materials used in creating homemade greeting cards and scrapbooks. (Miller Dep. 45-47; Ex. 18.)

In April 2007, Miller informed her supervisor Hegstrom that she needed to leave early to take intermittent FMLA leave, then logged off the Northwest system but stayed at her computer and printed order forms for Stampin' Up. (Ex. 15.) Hegstrom told Miller that if Miller needed to leave for purposes relating to the FMLA, she should do so, but that she should not be conducting outside work. (*Id.*)

Miller's supervisor Talbert also observed Miller's work with Stampin' Up. Miller's work for Stampin' Up came to Talbert's attention when Talbert observed Stampin' Up posters displayed in Miller's cubicle. (Talbert Dep. 97.) Talbert also observed Miller using company printers to print materials relating to Stampin' Up. (*Id.* at 150-51.) At the time Talbert became aware of Miller's work for Stampin' Up, Talbert informed Miller of Northwest's policies that may be implicated by her involvement with Stampin' Up, including that Miller was not allowed to use company property, time, or equipment to solicit sales. (*Id.* at 97-99.)

On September 25, 2007, Hegstrom used a program called Service Observe to listen to Miller's phone call with a Northwest customer inquiring about a package. (Hegstrom Dep. 95;

Ex. 17.)  In the Cargo Call Center, managers monitored their representatives' calls and customer interactions through programs like Service Observe and Click-to-Coach.  (Hegstrom Dep. 24.)  Service Observe allowed managers to listen to representatives' phone calls in real time.  (*Id.*)  Click-to-Coach captured both the audio portion of a phone call and the corresponding computer screen activity of the representatives' calls, which were recorded at random.  (*Id.* at 26-28.)

During the September 25, 2007 call, Miller discussed her Stampin' Up business with the Northwest customer, telling the customer about an upcoming "stamp camp" Miller was hosting and soliciting the customer's e-mail address in order to send her additional information about Stampin' Up.  (Hegstrom Dep. 95; Ex. 17.)  Later that day, Hegstrom reprimanded Miller in an e-mail communication.  (*Id.*)  Hegstrom advised Miller that her conversation with the customer regarding Stampin' Up and the solicitation of the customer's e-mail address for her Stampin' Up business was "in direct violation of several areas of the Northwest Airlines code of conduct."  (Ex. 17.)  Hegstrom told Miller that her conduct violated several sections of Northwest's code of conduct, including those prohibiting unauthorized use of company telephones for personal calls, insubordination (Hegstrom reminded Miller that she had been verbally advised in the past not to use company property for the Stampin' Up business), and outside work that interferes with an employee's efficiency and ability to perform her duties or creates a conflict of interest.  (*Id.*; *see also* Ex. 13 setting forth policies at issue.)  Hegstrom advised Miller that any further discussions with customers or use of Northwest property in connection with her stamp business would result in an immediate performance development action.  (*Id.*)

In December 2007, Talbert sent Miller an e-mail stating, "thank you so much for not using Northwest property for your 'Stamp it up' business.  I know you are aware of company policies prohibiting this conduct.  Thank you so much for your attention to these matters."

(Talbert Dep. 150; Ex. 19.) However, Talbert later continued to see Miller use company property for the Stampin' Up business after she sent the December 2007 e-mail. (Talbert Dep. 152.) In response, Talbert again advised Miller that she could not use company property for the stamp business. (*Id.*)

In spring 2008, Hegstrom saw another Stampin' Up flyer on Miller's printer. (Hegstrom Dep. 128-29.) Hegstrom told her supervisor Swanson, the Cargo Call Center manager, about Miller's activity. (*Id.*at 129.) Human resources manager Slocum and Swanson's supervisor Elizabeth Sagnes also became involved at the time. (*Id.* at 129, 135.) Sometime thereafter, Slocum and Swanson asked Hegstrom to use the Click-to-Coach system to determine if the system had captured any examples of Miller working on the Stampin' Up business on Northwest company time or using company resources. (Hegstrom Dep. 129, 138*.*) Hegstrom reviewed the random telephone calls collected by the Click-to-Coach system and captured screen shots of the instances she observed of Miller working on the Stampin' Up business. (*Id.* at 130-31.)

On June 17, 2008, Swanson sent an e-mail to all Cargo employees reminding them of Northwest's computer use policy, which among other things, prohibits use of the computer for solicitations for personal gain and profit. (Exs. 25, 26.) Swanson had previously distributed the policy to Cargo employees on September 27, 2007. (Ex. 25.)

Also in June 2008, Hegstrom noticed another of Miller's Stampin' Up flyers, which was advertising Miller's stamp camps to be held in Michigan, Miller's home state. (Hegstrom Dep. 88, 90-91; Ex. 29.) In response, Hegstrom reminded Miller that she was not permitted to use her company-provided flight benefits to fly to Michigan for another company's business purposes. (Exs. 28-29.) Hegstrom sent Miller an e-mail directing her to the Pass and Reduced Rate Travel Privilege Misuse Policy, which provides that pass travel may not be used for another company's

business purposes or for any type of personal gain.  (Ex. 28; Hegstrom Dep. 91.)  Miller questioned Hegstrom's directions and contacted Swanson's supervisor, Sagnes, to ask if she could conduct "stamp camps" while traveling on the company-provided flight benefits to Michigan.  (Ex. 29.)  Sagnes and human resources manager Slocum both advised Miller that she could not conduct such business while using the pass travel benefits.  (*Id.*)  On July 12, 2012, Miller used her pass travel benefits to fly to Michigan, on which trip Northwest believed her to be conducting a Stampin' Up camp as Miller's flyer had advertised.  (Ex. 29.)

## IV.    Q&A SESSIONS

On July 15 2008,  Hegstrom sent Slocum examples of Miller's Stampin' Up activity captured on the Click-to-Coach System, which showed Miller exchanging e-mails regarding Stampin' Up orders with a Stampin' Up customer while on her company computer during working hours.  (Ex. 35.)  Slocum forwarded the information to Director of Labor Relations Michael Cvengros, who suggested conducting a "Q&A" session with Miller, a session in which managers interview an employee to gather facts.  (*Id.*; Sagnes Dep. 90.)  Slocum agreed and prepared the questions for the Q&A.  (Ex. 35; Slocum Dep. 44-45.)  Slocum received input from Swanson, Hegstrom, Sagnes, and Talbert and reviewed the information they shared in developing the Q&A; she also reviewed the screen shot examples of Miller's Stampin' Up activity, attendance records, and flight usage records.  (Slocum Dep. 25-27, 44-45, 91.)

On July 18, 2008, Slocum and Swanson met with Miller and a union representative for the Q&A session.  (Ex. 36.)  Slocum and Swanson asked Miller questions relating to her pass travel use and her computer use for Stampin' Up purposes.  (*Id.*; Slocum Dep. 25-26.)  Slocum typed Miller's responses to the questions during the meeting as Miller responded.  (Slocum Dep. 74; Swanson Dep. 162.)

In response to the questions, Miller acknowledged that she had used her company-provided pass travel benefits to fly to Michigan and hold stamp camps while there in February, March, and June 2008.  (Ex. 36; *see* Swanson Dep. 230.)  Miller denied holding the stamp camp in Michigan in July 2008, explaining that she had cancelled that stamp camp after receiving the e-mails regarding the pass misuse policy.  (Ex. 36.)  Miller also acknowledged using the internet and printer at work for her Stampin' Up business, but stated that she had ceased doing so after receiving the computer policy reminder on June 17, 2008.  (*Id.*)  During the Q&A, Swanson and Slocum showed Miller over 30 screen shots captured from the Click-to-Coach system, which showed Miller accessing Stampin' Up and other personal business while taking phone calls with customers or in between the calls.  (Slocum Dep. 45-46; Ex. 37.)  The screen shots captured Miller's Stampin' Up work as late as July 11, 2008.  (Ex. 37.)  Miller stated that she worked on her Stampin' Up business at work, but typically in between customer calls or while waiting on hold.  (Ex. 36.)

Slocum and Swanson also asked Miler questions relating to her pass travel use on days she used sick leave or surrounding days she used sick leave.  (Ex. 36; Slocum Dep. 27.)  They questioned her regarding several incidents when they believed she had traveled on her company-provided flight benefits on the day following using sick leave, despite a Northwest policy that prohibits an employee from traveling on days they are absent from work or surrounded by sick days.  (Ex. 36.)  Miller acknowledged flying on days following taking sick or FMLA leave.  (*Id.*)  However, some of the dates Slocum and Swanson questioned Miller about were incorrect.  (Swanson Dep. 159.)  Swanson was not aware of the error at the time.  (*Id.*)

At the end of the meeting, Northwest suspended Miller with pay.  (Swanson Dep. 230-31.)  Miller requested to return to her desk to finish her time sheet and Slocum and Swanson

permitted her to do so. (*Id.*; Ex. 38.) While Miller was at her desk, Miller forwarded a large number of company files to her personal e-mail address. (Exs. 38-39.) Northwest security immediately notified Slocum of Miller's actions. (Ex. 39.) Swanson came to Miller's desk and told Miller that she needed to get off her computer. (*See* Ex. 42.) The files Miller sent to her personal e-mail account included call center statistics, customer levels, and goals, which Northwest considers proprietary. (Ex. 40.)

Slocum, Swanson, and Cvengros decided to hold a second Q&A with Miller to question her regarding her conduct after she returned to her desk after the first Q&A. (Ex. 41.) Slocum and Swanson met with Miller and a union representative on July 23, 2008. (Ex. 42.) Miller acknowledged that she copied attendance, statistics, and family medical leave files and sent them to her personal e-mail account. (*Id.*) Miller acknowledged that she copied entire statistics files including call center goals, call volume, and other statistics, explaining that she wanted the statistics relating to her. (*Id.*) Miller also acknowledged that the information was considered proprietary. (*Id.*)

## V. MILLER'S TERMINATION OF EMPLOYMENT

The next day, July 24, 2008, Northwest terminated Miller's employment. (Ex. 44.) Slocum drafted the termination letter, with input from Cvengros and Swanson. (Slocum Dep. 94; Swanson Dep. 176; Exs. 43, 45.) The decision to terminate Miller's employment was made as a group. (Swanson Dep. 176.) Swanson signed the termination letter and sent it to Miller. (Ex. 44.) The letter stated that Miller's employment termination was "a result of violations of the Rules of Conduct for Northwest Airlines Employees as determined as a result of a [thorough] Company investigation. Specifically, the Company has determined that you have conducted business related to your second occupation while being paid to perform your job at Northwest

Airlines." (*Id.*)  The letter cited numerous rules of conduct that Miller "specifically violated." (*Id.*)

## DISCUSSION

### I.     STANDARD OF REVIEW

#### A.      Summary Judgment Standard

Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion," and it must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  If the movant satisfies its burden, the party opposing the motion must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Krenik v. County of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995).  The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).

#### B.      Plaintiff's Untimely Summary Judgment Opposition

Defendants filed their motion for summary judgment on February 15, 2013.  (Docket No. 95.)  Pursuant to the local rules, Miller's responsive memorandum and supporting papers were due on March 8, 2013.  Local Rule 7.1(c)(2).  On March 11, 2013, Miller contacted the Court and requested a five day-extension to file her response to defendants' motion.  The Court granted Miller's request by Order issued later the same day, extending the deadline for Plaintiff's response until March 13, 2013.  (Docket No. 108.)  Despite the Court's extension and the clear

deadline set, Miller failed to file a responsive memorandum by the deadline or even prior to the April 10, 2013 hearing on Defendants' motion.

At the hearing on Defendants' motion for summary judgment, Miller presented to the Court and to Defendants for the first time her opposition to Defendants' motion, which consisted of a memorandum and affidavit with attached exhibits. Miller filed the memorandum and affidavit the day of the hearing, April 10, 2013, almost a month after Miller's opposition was due. (Docket Nos. 112-114.) At the hearing, Miller asserted that she had excuses for the delay, including medical issues and transportation difficulties. Defendants objected to Miller's untimely submissions and asked that they be stricken.

"If a party fails to timely file a memorandum of law, the Court may cancel the hearing and consider the matter on the papers, reschedule the hearing, refuse oral argument by the party who failed to file, award reasonable attorney fees to the opposing party, take some combination of these actions, or 'take any other action that the court considers appropriate.'" *Hewitt v. City of Minneapolis*, No. 12-cv-2132, 2013 WL 718189, at *5 (D. Minn. Feb. 27, 2013) (citing D. Minn. L.R. 7.1(g)). Here, Miller's submission was grossly untimely, despite the Court's extension of the deadline for her to file her response to the motion. Miller's failure to serve and file her opposition until appearing at the summary judgment hearing prevented Defendants the opportunity to offer any reply to her opposition. Given Miller's "undue delay and blatant disregard for the rules of Court," the Court refuses to consider Miller's untimely opposition to Defendants' motion for summary judgment. *See id.*

The Court will therefore consider Defendants' motion to be unopposed. *See Weseman-Roth v. Conversion Solutions, LLC*, No. 06-cv-1185, 2007 WL 656263, at *1 n.1 (D. Minn. Feb. 28, 2007). "But an unopposed motion for summary judgment is not necessarily a winning

motion for summary judgment." *Wiemann v. Engelhart*, No. 07-cv-3929, 2009 WL 3128041, at *2 (D. Minn. July 24, 2009). Even if a motion for summary judgment is unopposed, the district court still must determine that the moving party is entitled to judgment as a matter of law. *Interstate Power Co. v. Kansas City Power & Light Co.*, 992 F.2d 804, 807 (8th Cir. 1993).

## II.    ANALYSIS

The FMLA entitles employees who meet certain statutory requirements to a total of 12 weeks' unpaid leave from work during any 12–month period under various circumstances, including when an employee has a "serious health condition." 29 U.S.C. § 2612(a)(1); *Rankin v. Seagate Tech., Inc.*, 246 F.3d 1145, 1147 (8th Cir. 2001). An employee is entitled to leave for a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" includes "an illness, injury, impairment or physical or mental condition that involves. . .continuing treatment by a healthcare provider." 29 U.S.C. § 2611(B); 29 C.F.R. § 825.113(a). In order to show she has a serious health condition, a plaintiff must show "(1) that she had a 'period of incapacity requiring absence from work,' (2) that this period of incapacity exceeded three days, and (3) that she received 'continuing treatment by. . .a health care provider' within the period." *Rankin*, 246 F.3d at 1148 (quoting *Thorson v. Gemin, Inc.*, 205 F.3d 370, 377 (8th Cir. 2000); *Martyszenko v. Safeway, Inc.*, 120 F.3d 120, 122-23 (8th Cir. 1997)).

The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of. . .any right provided" under the Act or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by its terms. 29 U.S.C. § 2615(a)(1)-(2). Miller brings both an "interference" claim, in which the employee "alleges that an employer denied or interfered with his substantive rights under the FMLA," and

a "retaliation" claim, in which the employee "alleges that the employer discriminated against him for exercising his FMLA rights." *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006).

## A. FMLA Interference

Miller alleges that Defendants violated the FMLA by denying her Case No. 602 request for FMLA leave and failing to obtain a third opinion relating to Miller's request. (Compl. ¶¶ 48, 52; Miller Dep. 105.) She also alleges that Defendants violated the FMLA by denying her Case No. 511 request for FMLA leave. (Compl. ¶¶ 48, 50.)

Defendants argue that Miller's FMLA interference claim is barred by the statute of limitations because she did not bring suit within three years of when her FMLA requests were denied. Defendants also argue that Miller's claim fails because she was not entitled to FMLA leave, Miller cannot show Defendants willfully interfered with her right to leave, and Northwest was not required under the FMLA to obtain a third medical opinion relating to Miller's request for leave.

### 1. Statute of limitations

"Congress created a two-tiered statute of limitations for FMLA claims." *Hanger v. Lake County*, 390 F.3d 579, 582 (8th Cir. 2004). Generally, claims for FMLA violations must be brought "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). However, where an employer engages in a "willful violation" of the FMLA, the statute of limitations is extended to three years from the "date of the last event constituting the alleged violation for which such action is brought." 29 U.S.C. § 2617(c)(2). To demonstrate a "willful violation," a plaintiff must show that "the

employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Hanger*, 390 F.3d at 583-84.

Miller invokes the FMLA's three-year statute of limitations for willful violations, alleging that Defendants "willfully and intentionally" denied her request for FMLA leave and failed to obtain a third opinion. (Compl. ¶ 52.) She alleges the interference was willful because Northwest had an FMLA policy, knew of FMLA laws, and had a union contract referencing the FMLA, but denied her requests for leave anyway. (Miller Dep. 139-40.)

Even applying the three-year statute of limitations for willful violations to Miller's interference claim, her claim still fails to meet the statute of limitations. Miller's Case No. 602 request for FMLA leave relating to her chronic back and neck pain was denied on July 3, 2008. (Ex. 34.) Miller's FMLA interference claim relating to the denial of her request for leave accrued that day. *Reed v. Lear Corp.*, 556 F.3d 674, 681 (8th Cir. 2009) ("An FMLA violation occurs when an employer improperly denies a request for leave."); *Beekman v. Nestle Purina Petcare Co.*, 635 F. Supp. 2d 893, 906-07 (N.D. Iowa 2009) (rejecting plaintiff's argument that FMLA interference claim did not accrue until date of her termination rather than date the employer denied her request for leave). Miller filed suit on July 24, 2011, over three year after the denial of her Case No. 602 request for leave. Similarly, Miller's Case No. 511 request for FMLA leave relating to a leg injury was denied on November 6, 2007 (Compl. ¶ 21); her claim relating to the denial of that request accrued that day. Miller did not bring suit until more than three years later. Miller's interference claim fails to meet either the two or three-year statute of limitations. Her claim fails as a matter of law for failure to meet even the three-year statute of limitations.

2.   Willful interference

Even if Miller's claim was timely under the three-year statute of limitations, her claim would still fail for lack of evidence of any willful interference. Interference includes "refusing to authorize FMLA leave." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (quoting 29 C.F.R. § 825.220(b)). In an interference claim, an "employee must show only that he or she was entitled the benefit denied." *Id.* (internal quotation omitted). As discussed above, in order to prove willful interference, the plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Hanger*, 390 F.3d at 583-84. "[A]n employer's general knowledge regarding a statute's potential applicability does not prove willfulness." *Id.*

Here, there is no genuine issue of material fact whether Northwest's conduct in denying Miller's requests for FMLA leave rose to the level of a "willful" violation of the statute. Northwest's denial of Case No. 602 was based on an independent medical examination by Dr. Helms, which found no objective findings to corroborate Miller's subjective complaints, that any further treatment was not medically reasonable or appropriate, and the only further treatment or medication needed by Miller was the occasional use of Tylenol. (Ex. 30; Miller Dep. 169.) In the judgment of Northwest's FML Specialist Hazel Taylor, Miller was not entitled to leave because the medical examination indicated that Miller did not have a "serious health condition." (*See* Exs. 32-33; Swanson Dep. 227-28.) Even if Northwest was mistaken in this conclusion and Miller had presented evidence that she was entitled to the benefit denied, "where the employer tried to comport with the law and tenable reasoning undergirded its conduct," no willfulness will be found. *Bass v. Potter*, 522 F.3d 1098, 1104 (10th Cir. 2008); *see also Wilmath v. St. Joseph Mercy Health Ctr.*, No. 08-6011, 2009 WL 77616, at *3 (W.D. Ark. Jan. 9, 2009) ("That the

employer should have known that its actions would violate the FMLA is insufficient. Bare recognition that an employee had a right to leave under the FMLA and the employer violated that right is not sufficient to create a genuine issue of material fact concerning willfulness.").  Put simply, there is no evidence to suggest that Defendants knowingly violated, or acted in reckless disregard of, the FMLA's requirements.[4]

In addition, Miller's allegation that Northwest's failure to obtain a third medical opinion constituted a willful violation of the FMLA lacks merit.  The Eighth Circuit has held that decisions whether to obtain a second opinion, which statutory language mirrors that of the language regarding third opinions, are permissive, not mandatory, under the statute.  *Stekloff v. St. John's Mercy Health Sys.*, 218 F.3d 858, 860 (8th Cir. 2000) (FMLA language regarding obtaining second opinions is "merely permissive"); *see* 29 U.S.C. § 2613(d)(1) ("the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a third health care provider. . . .").  At least one district court in another circuit has found an employer's decision to seek a second opinion but not a third opinion does not amount to a willful violation of the FMLA.  *Porter v. New York Univ. Sch. of Law*, No. 09 Civ. 4693, 2003 WL 22004841, at *7-8 (S.D.N.Y. Aug. 25, 2003), *aff'd*, 392 F.3d 530 (2d Cir. 2004).  The Court cannot find that Defendant's failure to seek a third opinion was either a knowing violation of the FMLA or with reckless disregard to whether it violated the FMLA.

For all these reasons, Miller's claim fails as a matter of law and Defendants are entitled to summary judgment on Miller's FMLA interference claim.

---

[4]     Similarly, there is no evidence to suggest that Defendants knowingly violated, or acted in reckless disregard of, the FMLA's requirements when it denied Plaintiff's Case No. 511 request because it believed Miller had not been absent for more than three days.

## B.     FMLA Retaliation

Miller's remaining claim alleges that Defendants retaliated against her for exercising her rights to request and take FMLA leave.  (Compl. ¶¶ 54-55; Miller Dep. 84-85.)  Miller alleges that Northwest terminated her employment in retaliation for her April 2008 request for FMLA leave (Case No. 602) because on that request the duration of her condition was listed as permanent while previously it had been listed as periodic.  (Miller Dep. 85-87.)

The FMLA "prohibits employers from discriminating or retaliating against an employee for asserting her rights under the Act."  *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006); 29 U.S.C.§ 2615(a)(2).  An employer may not consider "an employee's use of FMLA leave as a negative factor in an employment action."  *Id.*  "Basing an adverse employment action on an employee's use of leave, or in other words, retaliation for exercise of [FMLA] rights, is therefore actionable."  *Id.* (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002)).  In the absence of "direct evidence" of retaliation, which Miller does not allege, this claim is analyzed under the *McDonnell Douglas* burden-shifting framework.  *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973)).

Miller must first establish a *prima facie* case of retaliation, which requires her to proffer sufficient evidence to show (1) she engaged in activity protected under the FMLA, (2) she suffered a materially adverse employment action, and (3) a causal connection exists between her conduct and the adverse employment action.  *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1007 (8th Cir. 2012).  If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the action.  *Phillips*, 547 F.3d at

912.  If the employer provides that evidence, the burden shifts back to the plaintiff to show that the employer's reason was pretextual.  *Id.*

Defendants argue that they are entitled to summary judgment on Miller's FMLA retaliation claim because Miller cannot show willful retaliation as required by the three-year statute of limitations, she cannot meet either the first or third elements of the *prima facie* case, and she cannot show that Northwest's reasons for her discharge were pretext for retaliation.

> 1.  Statute of limitations

Miller filed her complaint on July 24, 2011, three years after her July 24, 2008 discharge.  Miller failed to meet the two-year statute of limitations.  The three-year statute of limitations for "willful" violations must apply in order for her claim to survive.  *Hanger v. Lake County*, 390 F.3d 579, 582-84 (8th Cir. 2004).

> 2.  *Prima facie* case

Miller must first establish the three elements of the *prima facie* case.  It is undisputed that Miller suffered an adverse employment action when she was discharged and therefore the second element is met.  However, even if Miller had presented evidence that she was entitled to FMLA leave for Case No. 602 and therefore had engaged in a protected activity in satisfaction of the first element, the evidence fails to establish the third element of the *prima facie* case.  The evidence does not demonstrate a causal link between Miller's request for FMLA leave and her discharge.  The Eighth Circuit has stated that "an employee must prove that his exercise of FMLA rights 'played a part' in the employer's decision."  *Pulczinski*, 691 F.3d at 1007 (citing *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 963 n. 3 (8th Cir. 2012)).  "Evidence that gives rise to an inference of a retaliatory motive on the part of the employer is sufficient to establish a causal link."  *Hite v. Vermeer Mfg. Co.,* 446 F.3d 858, 866 (8th Cir. 2006) (citation

omitted). "The time lapse between the protected activity and the adverse employment action is an important factor in determining whether a causal connection exists." *Hansen v. Mannheim Servs. Corp.*, No. 04-4775, 2006 WL 47315, at *6 (D. Minn. Jan. 9, 2006) (citing *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1003 (8th Cir. 2005)). Generally, temporal proximity alone is insufficient to raise an inference of retaliatory motive; however, where the temporal proximity is "very close," it can raise such an inference. *Hite,* 446 F.3d at 866 (internal quotation omitted); *see also Smith,* 302 F.3d at 832-33. Here, Miller's Case No. 602 request for FMLA leave occurred on April 8, 2008 and she was discharged three and one half months later on July 24, 2008. The interval between the request for FMLA leave and the adverse employment action alone is insufficient to establish a causal connection. *See, e.g.*, *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1011 (8th Cir. 2005) (four month gap was insufficient to support causal link); *Kipp v. Missouri Highway and Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) ("[T]he interval of two months between the complaint and [plaintiff's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link"). The record does not reflect any further evidence giving rise to an inference of a retaliatory motive sufficient to establish a causal connection between Miller's FMLA request and her discharge. Accordingly, Miller has failed to make a *prima facie* showing of retaliation.

3.     Legitimate, non-retaliatory reason and pretext

Further, even if Miller had demonstrated a *prima facie* case, Northwest has proffered a legitimate, non-retaliatory reason for Miller's discharge. Northwest proffered that Miller's conduct using company property to work on her Stampin' Up business during working hours violated a host of policies, that Miller had violated the company pass travel policy by traveling to

Michigan on company-provided flight benefits and conducting stamp camps while there, and that Miller sent numerous company proprietary files to her personal e-mail account. (*E.g.*, Exs. 36, 42, 44.) "An employee's violation of employment policies can be a legitimate, non-retaliatory justification for termination." *Hansen v. Mannheim Servs. Corp.*, No. 04-cv-4775, 2006 WL 47315, at *6 (D. Minn. Jan. 9, 2006).

Once a defendant has articulated a non-retaliatory reason, the plaintiff must show that the stated reason is in fact pretextual. A plaintiff may demonstrate pretext by two different methods: "indirectly by showing that the employer's proffered explanation is unworthy of credence"; or "directly by persuading the court that a prohibited reason more likely motivated the employer." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006). Under the first method, "the employee must rebut the employer's underlying factual claims by establishing that the employer's explanation has no basis in fact." *Id.* (internal quotation omitted). Under the second method, "the employee must demonstrate that sufficient evidence of intentional retaliation exists for a jury to believe the plaintiff's allegations and find that the proffered explanation was not the true motivating explanation." *Id.* (internal quotation omitted).

Miller alleges that Northwest's asserted reasons for her discharge were not the true reasons and asserts that defendants created a work environment in order to build a case against her. (Compl. ¶ 55.) She alleges that she was monitored differently than other employees, that Defendants did not do a thorough investigation of her conduct, and that they used incorrect information at the Q&A. (*Id.* at ¶¶ 57-60.)

Notwithstanding these allegations, Miller cannot carry her burden to show that Northwest's proffered reason was pretext for retaliation. The evidence indicates that Miller's policy violations relating to working on her Stampin' Up business on company time and property

and her conduct after the first Q&A, not her FMLA leave requests, prompted Northwest's decision to terminate Miller's employment.  Northwest approved many FMLA leave requests for Miller during her employment, including a request as late as June 2008, lending credibility to Northwest's proffered reason for the termination.  *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001); *Platt v. Lamrite West, Inc.*, No. 1:10 cv 1107, 2011 WL 3625564, at *12 (N.D. Ohio Aug. 17, 2011).  The Court further finds no evidence in the record indicating that Miller was treated differently than similarly-situated employees.  In addition, Miller's allegations regarding incorrect information used in the Q&A session are insufficient. "[E]stablishing that an employer's decisions were unwise or that its reasons for an adverse action were based on an erroneous interpretation of an employee's actions. . .does not prove that the employer's asserted reasons are pretextual." *Jackson v. Lakewinds Natural Foods*, No. 08-398, 2009 WL 2255286, at *4 (D. Minn. July 28, 2009) (internal citation omitted); *see also Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) ("[T]he proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believes the asserted grounds at the time of termination.").  There is simply no evidence that would allow a reasonable jury to draw a reasonable inference that Northwest was motivated by retaliatory intent relating to Miller's request for FMLA leave.  Nothing in the record suggests willful retaliation.

Accordingly, because Miller can neither establish a *prima facie* case of retaliation nor show that Northwest's proffered reason for her discharge was pretext for discrimination, her claim fails as a matter of law and Defendants are entitled to summary judgment on Miller's FMLA retaliation claim.

## RECOMMENDATION

Based upon the record, memoranda, and oral arguments of counsel, **IT IS HEREBY RECOMMENDED** that:

1. Defendants' Motion for Summary Judgment (Docket No. 95) be **GRANTED**; and

2. Plaintiff's Complaint (Docket No. 1) be **DISMISSED WITH PREJUDICE.**


Dated:   August 19, 2013                           s/Arthur J. Boylan
                                            Chief Magistrate Judge Arthur J. Boylan
                                            United States District Court


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court on or before  September 3 , 2013.